UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT MARTIN, as Personal Representative
of the estate of DARLENE MARTIN,
Deceased,

               Plaintiff,                          Case Number 17-11845

v.                                             Honorable David M. Lawson

MICHIGAN DEPARTMENT OF CORRECTIONS,
LT. MICHAEL NELSON, SGT. EARL FISHER,
OFFICER DANITRA CALLINGTON, OFFICER WANDA
LOWE, OFFICER TRACI MAUPINS, OFFICER
SAMANTHA MASON, OFFICER PAUL McPHERSON,
OFFICER RENIKA McQUEEN, OFFICER KRISTIN
POTTER, CORIZON HEALTH, INC., MHM
CORRECTIONAL SERVICES, INC., MHM SERVICES,
INC., JUAN GARBINSKI, MSW, MARGARET A.
GETTY, MA, INEZ B. PORTER, LMSW, VINCENT
PERNELL, MD, KATHERINE HAMMONS, RN,
PENNIE LOTT, RN, KELLY M. McDONNELL, RN,
WARREN MILLICENT, DAVID JOHNSON,
BEVERLY SMITH, SGT. ANDREWS, SHANNON BASS,
DIANNA CALLAHAN, LASHAWNA DONALD,
VINCENT GAUCI, ALEXIA JOHNSON, LT. THOMAS
LENGYEL, CO KITTIE PAUL-TWITTY, SGT. ROE,
CO R'KIA TAYLOR, AUC DENISE ARMSTRONG,
CLAIRE PEI, and CO TAMMY YOUNG,
Jointly and Severally,

               Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS BY DEFENDANTS CORIZON HEALTH AND CLAIRE PEI, D.O., DISMISSING COUNT IV OF THE UNIFIED COMPLAINT AS TO THOSE DEFENDANTS, ONLY, AND CANCELLING HEARING

       This lawsuit was prompted by the death of Darlene Martin, who died of dehydration while

she was in the custody of the Michigan Department of Corrections (MDOC), serving a sentence

for shoplifting.  She was suffering from mental illness at the time of her death.  Her estate sued the

Department, several of its employees, and others, including the outside contractor that provided medical services to various MDOC prisons (Corizon Health, Incorporated) and its employee who handled Martin's medical care (Claire Pei, D.O.). The plaintiff's theory of liability against Corizon and Pei is that they were deliberately indifferent to Martin's obvious medical needs in violation of the Eighth Amendment, and they discriminated against her and failed to accommodate her as required by the Americans with Disabilities Act. Corizon and Pei have moved to dismiss the amended complaint alleging that it fails to state a proper claim for relief. Because the motion and response fully set forth the arguments, and oral argument will not assist in the disposition of the motion, the Court will decide it on the papers. *See* E.D. Mich. LR 7.1(f)(2). The plaintiff has stated a viable claim against these defendants under the Eighth Amendment but not under the ADA. Therefore, the Court will grant the motion to dismiss in part and deny it in part.

Defendants MHM Correctional Services, MHM Services, and Vincent Pernell filed a paper styled as a "concurrence and adoption" of Corizon's and Pei's motion. But that paper does not develop or discuss the arguments, it does not explain how they apply to those defendants, and it is not accompanied by a brief, as required by E.D. Mich. LR 7.1(d)(1)(A). Therefore, the "concurrence and adoption" will be disregarded.

## I. Factual Allegations

The plaintiff initially brought suit in this Court against a large number of defendants, including John Doe parties. He also sued several other defendants in a separate action in this Court. Eventually, all his claims were consolidated in an amended and "unified" complaint in the present action. The facts discussed below are taken from that pleading.

In December 2013, sixty-six-year-old Darlene Martin began serving her sentence for retail fraud at the MDOC's Women's Huron Valley Correctional Facility (WHV). Sometime in early

June 2014, an unnamed corrections officer noted that Martin was complaining about fellow inmates harassing her and wanting to perform sexual acts on her. Shortly thereafter, Martin began exhibiting signs of mental illness. Her symptoms included talking to herself, talking incessantly for 24 hours at a time, insomnia, and agitation. She was diagnosed with adjustment disorder with anxiety and antisocial personality with auditory hallucinations.

At the time, defendant Claire Pei, D.O. was the internal medicine physician assigned to oversee and manage Martin's general medical issues. In early June, Martin had been diagnosed with an infection for which she received antibiotics ordered by Dr. Pei. According to the unified complaint, Martin's diagnoses and serious medical needs were well known to all defendants.

On June 10, 2014, Martin was transferred to Segregation Cell #112 of Housing Unit #1C at WHV. As a condition of her solitary confinement, Martin was to be regularly checked and monitored by the corrections officers assigned to her cell, a protocol known as "close observation rounds." The plaintiff alleges (on information and belief) that between June 10 and June 22, (i) defendants Millicent, D. Johnson, Smith, Andrews, Bass, Callahan, Callington, Donald, Fisher, Gauci, Godfrey, A. Johnson, Lengyel, Lowe, Maupins, Mason, McPherson, McQueen, Paul-Twitty, Potter, Roe, Sawaya, Strickland, Taylor, Thomas, and Young were the corrections officers assigned to the segregation area of Unit #1C and Cell #112 and were responsible for ensuring or performing close observation rounds of Martin; (ii) defendants Bailey, Bertoni, Hammons, Iott, McDonnell, and Pei were the medical services personnel assigned to Martin's cell and responsible for Martin's medical care and her daily segregation nursing rounds; and (iii) defendants Armstrong, Getty, Garbinksi, Pernell, and Porter were the mental health services personnel assigned to Martin's cell and responsible for her daily segregation mental health rounds.

Between June 10 and June 24, Martin's condition worsened. On June 11, defendant Katherine Hammons, a registered nurse at WHV, requested that Martin be evaluated for mental health services in light of her auditory hallucinations, agitation, aggressiveness, and incessant talking since the previous day. That same day, defendant Inez B. Porter observed Martin cursing and acting agitated. Porter, a licensed social worker who practiced psychology at WHV, diagnosed Martin with adjustment disorder and antisocial personality disorder, but did not recommend a treatment plan. On June 13, in addition to her incessant rambling and auditory hallucinations, Martin was observed flooding her cell with sink and toilet water, pushing all water out of her room, dancing in the window naked, spreading her food out on the floor, spitting on the floor, and cursing. Her medical chart at the time, believed to be annotated by Dr. Pei, reflected that Martin was at risk for heat related illness, and she was suffering from an untreated urinary tract infection, conditions known to Dr. Pei. The plaintiff alleges that Martin's mental illness prompted "Defendant custody staff," including corrections officers Dianna Callahan and Traci Maupins, as well as Porter, to taze Martin on June 13. No notes or records explaining how or why the tazer was used were turned over to the plaintiff.

That same day, responding to Martin's behavior, Nurse Hammons again requested mental health services for Martin. Porter evaluated Martin and observed that "resident's mental status has further decompensated, behavior is becoming self-harming." She noted that Martin was suffering from sleep deprivation, poor hygiene, agitation, aggression, hyperactive psychomotor behavior, anxious and elevated mood, poor reasoning, poor impulse control, incoherent thought processes, paranoia, and delusional thought content. Porter determined that Martin's risk for self-injury necessitated welfare checks every 15 minutes in addition to one-on-one observation or continuous video surveillance in a suicide observation cell. The treatment plan included instructions to

observe and report certain behaviors, such as Martin's refusal of medications or meals, and directed mental health staff to re-evaluate Martin every business day. All housing staff, including the corrections officer-defendants, received Martin's treatment plan.

Despite all that, Martin continued to receive inadequate medical attention, as the plaintiff characterizes it. Constant supervision and one-on-one observation began on June 15, but it was administered by fellow inmates rather than by corrections or medical and mental health personnel. Those inmates were not properly trained or made aware of Martin's treatment plan. To make matters worse, at approximately 8:45 a.m., defendant Lieutenant Michael Nelson instructed corrections staff to turn off all water to Martin's cell as a punishment for allowing toilet water to spill on her blanket. This left Martin without running water or a working toilet, and she became progressively dehydrated over the next several days.

On June 17, defendant Porter evaluated Martin and determined that her impaired ability to function, poor reasoning, impulse control, insight and judgment, and high risk level for suicide warranted referral to Acute Care.

By June 18, Martin's mental health was in steep decline. That morning, Martin was observed engaging in frequent outbursts, pacing in her cell, urinating frequently due to incontinence, and playing in her own urine. She was saturated with filth and her feet were significantly pruned from standing in her own sewage, urine, and excrement. Records from that day indicate that Martin had not been eating, drinking any water, or sleeping, prompting nursing staff to call mental health services for evaluation. Defendant Dr. Pernell subsequently performed an acute psychiatric evaluation on Martin and determined that she was suffering from schizoaffective disorder. Martin's GAF score was 20; she was a danger to herself or others, was unable to maintain basic hygiene, and had an impaired ability to understand or communicate. Dr.

Pernell concluded that Martin's condition made her incapable of caring for herself and unable to cooperate with recommended interventions such as psychotherapy and psychotropic medications. He noted that Martin needed to be transferred to the WHV Acute Psychiatric Care Unit for emergent medical care, acute psychiatric evaluation and treatment, and an order for involuntary treatment with an understanding that Martin would be treated on an emergent basis until the order was obtained. He ordered that evaluation and treatment was to be performed by a multidisciplinary treatment team, including MDOC's internal physician Dr. Pei, who would administer a detailed physical exam and laboratory studies and would manage any other medical issues. According to the plaintiff, Dr. Pei never saw or evaluated Martin or formulated a treatment plan as ordered by Dr. Pernell. Dr. Pernell noted that he had never seen someone so dehydrated. At that point, Martin had developed white sores all over her lips and tongue and would exclaim that she was thirsty. Corrections staff refused to give Martin a cup out of concern that in her reduced state she would spill water on the floor.

Later that day, Martin was seen by defendant Margaret Getty, a licensed psychologist at WHV. When Getty arrived at Martin's cell, she saw Martin walking around naked and taking dirty water from the toilet and throwing it about the cell. The walls were covered in smeared food and feces, but Martin was unaware of herself or her surroundings. When Getty attempted to interact with Martin, she had an expressionless face and her tongue dangled out of her mouth. Martin was unresponsive to Getty's questions, instead answering "naw naw naw." Angered by Martin splashing water, Getty issued Martin a citation, which ensured Martin would remain in solitary confinement.

The plaintiff alleges that on June 19, Martin's condition reached new lows, as did her medical care. That morning Nurse Hammons noted that Martin displayed signs of confusion,

mania, and insomnia, and appeared to be suffering from anorexia, loss of appetite, frequent urination on the floor, bedding, and her clothes.  After observing Martin playing in her commode and foaming at the mouth, Hammons placed another call to mental health services.

Dr. Pernell decided that Martin required medication, ordering 10 mg of Zyprexa, an antipsychotic used to treat schizophrenia, and 2 mg of Ativan (a benzodiazopene used to treat anxiety).  Both drugs carry significant side effects.  Zyprexa is known to cause sedation, hyperglycemia, and a decrease in consciousness, while Ativan can cause sedation and low blood pressure.  According to the plaintiff, their combined administration is not recommended and associated with excessive sedation, severe hypotension, and even death.  The first injection at 9:00 a.m. on June 19 caused Martin to become drowsy and she slept the entire day.  Defendant Garbinski, a social worker at WHV, conducted Martin's mental health visit that day and noted that she was sound asleep from the injections. Despite all that, between June 19 and June 22, Martin continued to receive twice daily intramuscular injections pursuant to Dr. Pernell's orders.

On Friday June 20, defendant Getty observed Martin sitting naked at the foot of her bed, with her head down and legs spread, as if she were going to the bathroom.  Drowsy and confused, Martin was unable to recall her name or what day it was, responding "naw naw naw."  The plaintiff alleges that Getty decided that Martin only should be evaluated by mental health staff on business days.  The plaintiff alleges in the alternative that defendant Getty did not see Martin on June 21, and that it was Nurse Denise Bertoni who saw her and should have requested a mental health evaluation as soon as possible.

The following morning, Martin still was not eating or drinking and was experiencing episodes of incontinence.  A strong urine odor emanated from her room.  After receiving her morning injections, Martin was seen sitting in her bed with her head falling into her lap.  She could

not get out of bed. Later that evening, Martin was observed desperately trying to drink water from the disconnected sink in her cell. At approximately 9:00 p.m., defendant Nurse Pennie Iott administered Martin's Zyprexa and Ativan injections in her right deltoid. The plaintiff alleges that based on the medication record, Iott may have given Martin 10 mg of Ativan instead of the prescribed 2 mg. Shortly thereafter, Martin became even more drowsy and sedated and was seen unsuccessfully attempting to get out of bed. From 11:30 p.m. that night through the morning of June 22, Martin remained face down and naked in her bed.

On the morning of June 22, defendant Nurse Kelly M. McDonnell administered Martin's injections. Martin was lethargic and could not move except propping her head up a couple inches. She was heard saying, "I can't breathe" and complaining of chest pains. Nurse McDonnell did not ask Martin if she was okay or how she was feeling and did not check her vital signs before injecting her with medication. Martin was severely dehydrated, laying on her stomach, lethargic, and virtually unresponsive. Shortly thereafter, Nurse McDonnell advised Dr. Pernell and the corrections staff of the drugs administered and Martin's lethargic state, noting that Martin had not been eating or drinking. Although Martin was seen by medical staff that week, no one had checked her vital signs. Martin had not eaten or had anything to drink for several days. Martin remained motionless in her bed, naked and face down, from 8:00 p.m. the night before through 4:00 p.m. on June 22. Nurse McDonnell observed Martin in this motionless state several times that day, but never made any attempt to check on or talk to her.

At approximately 4:00 p.m. on June 22, a prisoner observation aid reported to corrections staff that Martin was motionless, unresponsive, and not breathing. Responding corrections and medical staff, including defendants Johnson, Nelson, Fisher, Lowe, Maupins, McPherson, McQueen, Potter, Smith, and McDonnell, found Martin on her mattress completely unresponsive,

not breathing, and lying on her stomach with her face in body fluids. The plaintiff alleges that these defendants delayed the start of CPR until all responding persons were present in the cell and the defibrillator was retrieved from another part of the facility. They eventually performed CPR for about 45 minutes, and Martin's circulation returned.

Martin was taken to St. Joseph Mercy Hospital, where she was diagnosed with hypoxic respiratory failure, severe dehydration (a water deficit level of 11 liters), liver failure, and renal failure. As a result of her dehydration and respiratory failure, Martin suffered from severe anoxic brain injury and associated complications that required 24-hour in facility supervision and care. Martin eventually passed away on October 12, 2017 as a result of complications secondary to her respiratory arrest.

On June 9, 2017, the plaintiff as appointed conservator for his mother Darlene Martin, filed a complaint against the MDOC and several corrections officers, doctors, nurses, and mental health workers. He also filed a second lawsuit against different defendants. After the cases were consolidated and the pleadings reorganized, the plaintiff — now Darlene Martin's estate's personal representative since her passing — brings five counts: deliberate indifference under the Fourth and Eighth Amendments asserted via 42 U.S.C. § 1983 against the correctional officers (Count I); the medical services defendants (Count II); and the mental health services defendants (Count III); violation of the American with Disabilities Act (Count IV); and an additional count of deliberate indifference against defendants Robin Howard and Renata Patton for ignoring prisoner observation aides' warnings that Martin was in distress and without food and water (Count V). The present motion was brought by Dr. Pei, who is named in Count II, and her employer, Corizon Health, which is named in Counts II, III, and IV.

## II. Discussion

Defendants Corizon and Pei argue that the plaintiff cannot maintain a claim under Title II of the ADA because they are private contractors and not public entities that are subject to that section of the Act. Dr. Pei contends that she was added to this case after the statute of limitations expired, and both defendants contend that they were not involved with Darlene Martin's care during her period of decline, so the plaintiff has failed to state a claim against them for an Eighth Amendment violation. To support this last argument, these defendants ask the Court to take judicial notice of MDOC's contracts with Corizon and MHM Correctional Services, another medical contractor, to establish that MHM had the exclusive contractual obligation to provide mental health services to MDOC prisoners. The plaintiff has not responded to the argument attacking the ADA claim, but opposes the other grounds stated in the motion.

The purpose of a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiffs are entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiff "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678],

129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

When deciding a motion under Rule 12(b)(6), the Court looks only to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L.Ed.2d 1 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

## A.  ADA Claim

In Count IV of the unified complaint, the plaintiff alleges that "DECEDENT was an individual and Defendant MDOC was a public service within the meaning of the Americans with Disabilities Act ("ADA"), being 42 U.S.C. 12131, *et seq.*," and that all the "Defendants" had a duty to accommodate Martin's psychiatric disability and failed to do so.   Unified Compl. ¶¶ 182, 185-89.  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Corizon and Dr. Pei argue that they are not  subject to Title II because they are not public entities.  The plaintiff does not contest this point, and with good reason.

Under Title II, "'[p]ublic entity' includes 'any state or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C. § 12131(1)(A) & (B)). "Title II of the ADA does not, however, provide for suit against a public official acting in his individual capacity." *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009) (citations omitted). Further, "[a] private contractor does not become a 'public entity' under Title II merely b[y] contracting with a governmental entity to provide governmental services." *Cox v. Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) (citing *Green v. City of New York*, 465 F.3d 65, 78-79 (2d Cir. 2006); *O'Connor v. Metro Ride, Inc.*, 87 F. Supp. 2d 894, 900 (D. Minn. 2000)); *see also Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015) ("And with respect to defendants Swanhart, Glotfelty, and Corizon Health, Inc., we agree with the Court of Appeals for the Eleventh Circuit that 'a private corporation is not a public entity merely because it contracts with a public entity to provide some service.'") (quoting *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010)).

Similarly, if Count IV is meant to include Dr. Pei, she is entitled to relief. *Lee v. Michigan Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) ("Lee may not maintain an action under the ADA . . . against the individual defendants identified in his complaint because . . . the ADA . . . [does not] impose liability upon individuals."); *Cox v. Jackson*, 579 F. Supp. 2d at 850 (granting summary judgment in favor of individual prison officials with respect to plaintiff's ADA claims).

Count IV of the unified complaint will be dismissed as to defendants Corizon Health and Dr. Claire Pei.

### B. Statute of Limitations

Dr. Pei argues that her last contact with Martin occurred on June 12, 2014, and that the first amended complaint, which added Dr. Pei as a party, was filed on June 13, 2017, beyond the three-year statute of limitations. In support of that argument, she relies on certain medical records (Exhibits A through C) that were filed under seal without permission. The Court struck those documents in an order entered December 11, 2017, and the defendant never sought to resubmit them. Therefore, they play no role in this decision.

In Michigan, a three-year statute of limitations applies to federal claims brought under 42 U.S.C. § 1983. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009). A section 1983 claim accrues "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (citations, quotations marks, and brackets omitted). "In actions brought under § 1983, the statute of limitations begins to run when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Ibid.* (citing *Kelly v. Burks*, 415 F.3d 558, 561 (6th Cir. 2005)). "A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). A claim for deliberate indifference accrues when an inmate is denied the medical attention she seeks or requires. *See Hawkins v. Spitters*, 79 F. App'x 168, 169 (6th Cir. 2003); *Owens v. Naylor*, 71 F. App'x 519, 521 (6th Cir. 2003).

The plaintiff alleges in the unified complaint that Martin was deprived of adequate medical care at various times between June 10 and June 22, 2014. Count II of the unified complaint states that from June 18, 2014 through June 22, 2014, Dr. Pei ignored defendant Dr. Pernell's directive to conduct physical exams, review laboratory students, and formulate a treatment plan for Martin. *See* ¶¶ 165-69. Looking only at the pleadings and accepting the factual allegations as true, the

plaintiff's claim of deliberate indifference against Dr. Pei plausibly accrued on June 18, 2014, within the period of limitations. Therefore, the claims against Dr. Pei are not time-barred.

## C. Deliberate Indifference

### 1. Dr. Pei

Relying once again on the stricken medical records, and citing the summary judgment standard, the defendants argue that there is no genuine dispute as to any material fact regarding the plaintiff's deliberate indifference claim against the Corizon defendants. The defendants argue that there is no evidence that Dr. Pei failed to address, or consciously disregarded, any of Martin's medical needs as Dr. Pei was on vacation during the relevant time period. Referring to medical records attached to the motion but not referenced in the unified complaint, the defendants argue that Dr. Pei treated Martin in early June for an abscess on her buttock and her last involvement with Martin was on June 12, when she approved a verbal order for an enema. The defendants assert that Dr. Pei adequately treated Martin for her abscess, and that Dr. Pei played no part in Martin's health care when she went into decline between June 18 and June 22.

It is well established that the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). To state a claim for deprivation of medical care under the Cruel and Unusual Punishment Clause, the plaintiff must state facts that satisfy both an objective and a subjective test. *See id.* at 834; *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991). The objective component requires a showing that the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *Ibid.* The conduct must deprive the plaintiff of

-14-

"the minimal civilized measure of life's necessities." *Ibid.* The Sixth Circuit has held that "a medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

To satisfy the subjective component, the plaintiff must show that the official acted with a sufficiently culpable state of mind; that is, that the conduct was "wanton." *Wilson*, 501 U.S. at 302; *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson*, 501 U.S. at 302-03; *see Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). Under that standard, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "[A] prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering." *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

"A prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle*, 429 U.S. at 104)). "The clearly established right to be free from deliberate indifference to medical needs extends to an inmate's psychiatric needs." *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (citations omitted). The Sixth Circuit "'distinguish[es] between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment,' such that

where medical care is merely inadequate, this Court is 'generally reluctant to second guess medical judgments.'" *Id.* at 939 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). "Nevertheless, treatment may be constitutionally impermissible when it is so woefully inadequate as to amount to no treatment at all." *Ibid.* (internal marks omitted). "Even relatively short periods of delay or neglect have sufficed." *Darrah v. Krisher*, 865 F.3d 361, 368 (6th Cir. 2017) (collecting cases). "It is insufficient for a doctor caring for inmates to simply provide some treatment for the inmates' medical needs; rather, 'the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm.'" *Richmond*, 885 F.3d at 940 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).

Based on the pleaded facts, the objective element of the two-part test unquestionably is met. The unified complaint states that in early June 2014, Martin started exhibiting symptoms of mental illness and was diagnosed with adjustment disorder with anxiety and antisocial personality disorder with auditory hallucinations. Unified Compl. ¶¶ 82, 92. According to the unified complaint, on June 18, defendant Dr. Vincent Pernell determined that Martin was suffering from schizoaffective disorder and ordered involuntary treatment. ¶¶ 109-11. The plaintiff has pleaded sufficient facts showing that Martin was suffering from a serious psychological ailment. *See Richmond*, 885 F.3d at 943 ("As Richmond has shown that she was suffering from mental illness 'that ha[d] been diagnosed by a physician as mandating treatment,' she has shown that she was suffering from a serious medical need.") (quoting *Blackmore*, 390 F.3d at 897); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006) ("[L]ittle room for debate exists about the objective component of Clark-Murphy's Eighth Amendment claim. In the abstract, the deprivation of water and medical care, including psychological services, of course would be 'sufficiently serious' to satisfy this requirement."); *Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018)

("Finley swallowed a razor blade. That is more than enough to indicate a severe psychological disorder.").

The subjective component is satisfied as well. The pleaded facts establish that Dr. Pei knew that Martin was at a substantial risk of serious harm, and yet consciously disregarded that risk. The defendants — curiously citing the summary judgment standard under Federal Rule of Civil Procedure 56 — argue that there is no evidence that Dr. Pei had any involvement in Martin's treatment during the relevant time frame. The unified complaint states otherwise.

The plaintiff alleges that Dr. Pei was assigned to Martin's care from June 10 through 22, 2014, while Martin was in segregation. Unified Compl. ¶¶ 77, 89. The plaintiff also alleges that Dr. Pei knew that Martin was not taking the antibiotic that Dr. Pei prescribed, and that Dr. Pernell ordered Dr. Pei to conduct an examination of Martin and medically manage her. *Id.* ¶¶ 159-61, 165-66. And the plaintiff also alleges that Dr. Pei "ignored Defendant PERNELL's directive and order, as well as Defendant PEI's own knowledge and understanding of the Plaintiff's serious medical needs, and refused to see, evaluate, and provide medical care to Plaintiff," and that "[f]rom June 18, 2014 through June 22, 2014 (the date Plaintiff was found unresponsive), Defendant PEI never saw or evaluated the Plaintiff and never formulated a Treatment Plan as directed and ordered by Defendant PERNELL." *Id.* ¶¶ 168-69.

These facts track those reported in *Clark-Murphy*, where decedent Clark, who was suffering from a psychotic episode, languished in an observational cell for six days before dying of dehydration. 439 F.3d at 283. While under observation, Clark was heard barking and yelling and could not otherwise carry a conversation. *Ibid.* By the second day, the water to Clark's cell had been turned off, and his requests for water were ignored. *Id.* at 284. As here, Clark's mental state quickly deteriorated, causing him to urinate in his cell and smear food on the walls. *Id.* at

284-85.  Despite being diagnosed with "psychosis" during this time, Clark never received psychiatric help.  *Id.* at 285.  At the time Clark's rigor mortis body was discovered, the water to his cell was turned off and his toilet was dry.  *Ibid.*  On appeal, the court denied qualified immunity as to 11 prison officers based on a finding that the plaintiff had "presented sufficient evidence from which . . . these defendants . . . could have inferred that a substantial risk of serious harm existed to Clark's health and safety from the deprivation of water or psychological treatment, or both."  *Id.* at 287.  Addressing the subjective element of the deliberate indifference analysis, the court noted that each of the defendants "repeatedly perceived sufficient facts to infer that Clark faced serious risks to his health and safety," including the psychologist who had diagnosed Clark with psychosis but failed to address the problem during his examination.  *Id.* at 289.

Here, the unified complaint contains sufficient facts to show that Dr. Pei knew that Martin "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  Not only was Dr. Pei familiar with Martin's existing medical conditions, but, according to the pleaded facts, she also failed to provide the care that was ordered.  *See Richmond*, 885 F.3d at 940-41 ("[A] finding of the failure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference to an inmate's serious medical needs.") (citing *Boretti*, 930 F.2d at 1154).  Discovery may prove otherwise, but the factual inquiry that the defendants implore the Court to engage in is reserved for a later day.  *See Obomanu v. Warren*, No. 17-11435, 2018 WL 3020525, at *4 (E.D. Mich. June 18, 2018) (noting that whether deliberate indifference claim against defendant Dr. Claire Pei "will survive summary judgment after the record is developed is another matter").  At the pleading stage, both the objective and subjective components easily are satisfied.

## 2. Corizon

Corizon Health, Dr. Pei's employer and a private corporation contracted to provide medical services to the MDOC, separately argues for dismissal of Counts II and III of the unified complaint. First, devoting just one line of its brief to Count II, the defendants assert that there is "no evidence that Corizon was the 'moving force' behind any alleged constitutional violation."

"Private corporations that 'perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law.'" *Rouster v. County of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) (quoting *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996)). "However, private corporations cannot be held liable on the basis of respondeat superior or vicarious liability." *Ibid.* (citing *Street*, 102 F.3d at 818)). A plaintiff therefore must plead facts that establish "both that his or her constitutional rights were violated and that a policy or custom of the [entity] was the 'moving force' behind the deprivation of the plaintiff's rights." *Id.* (citations and internal marks omitted). The plaintiff has done so.

The unified complaint contains the following allegations:

171. That the Medical Services Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train and/or supervise its employees/agents, were the motivating force for the individual Defendants' conduct as described herein, such that same also amounted to a deliberate indifference to Plaintiff's Decedent's well-being and serious medical needs.

172. Specifically, Defendants CORIZON and MHM were responsible for overseeing the medical and psychiatric care provided to inmates, including the coordination of the delivery of that medical care.

173. Defendants CORIZON and MHM Policies and Procedures implemented to deliver and coordinate said medical services to inmates were deliberately indifferent to Plaintiff's serious medical needs in that said policies did not ensure that serious medical conditions were tended to, and did not ensure that medical care would be carried out as requested and/or ordered by treating medical personnel at the jail.

The plaintiff then lists 27 acts or omissions illustrating a failure to train or supervise over the twelve days in which Martin's health deteriorated. Unified Compl. ¶ 174. These facts, when read with the allegations against Dr. Pei and the other individual defendants, plausibly allege both that Martin's constitutional rights were violated and that Corizon's policy or custom of failing to train and supervise its employees was a "moving force" behind the deprivation of Martin's rights. *Rouster*, 749 F.3d at 453.

Count III pleads a claim of deliberate indifference against the "mental health services defendants." Corizon argues that the plaintiff improperly is attempting to hold it vicariously liable for the MHM defendants' actions as Corizon had no hand in the mental health services provided at WHV during the relevant time period. To support that argument, Corizon points to its Exhibit D, a report to the Michigan legislature that summarizes physical and mental health expenditures itemized by vendor, as well as websites containing information on MDOC's vendor contracts. Corizon asks the Court to take "judicial notice" of those sources, arguing that they are public records. Corizon points to *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010), to support its argument. There, the court of appeals concluded that the district court did not abuse its discretion when it considered matters outside the pleadings in its exposition of the background of Michigan gaming. Critically, the court explained that "'those matters simply filled in the contours and details of the plaintiff's complaint, and added nothing new.'" *Id.* (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)). But the court also found that "*such materials did not speak to any disputed fact.*" *Id.* (citing *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)) (emphasis added).

Here, the defendants do not ask the Court to take judicial notice of the report to the legislature and the internet materials to "simply fill[] in the contours and details of the plaintiff's

complaint" but to resolve a fact dispute. The defendants rely on these outside sources to refute allegations found in Count III of the unified complaint and to disassociate Corizon from the acts or omissions committed by the MHM defendants. The unified complaint does not incorporate by reference those records, and they do not alone refute the plaintiff's claim that Corizon was deliberately indifferent to Martin's mental health needs. They are not the type of extraneous document that can be considered on a motion under Rule 12(b)(6).

The unified complaint itself, however, identifies Corizon Health among the "mental health services defendants" named in Count III and in relevant part alleges:

> 178. That the Mental Health Services Defendants adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train and/or supervise its employees/agents, were the motivating force for the individuals Defendants' conduct as described herein, such that same also amounted to a deliberate indifference to Plaintiff's Decedent's well-being and serious medical needs.

As in Count II, the unified complaint then sets forth 21 instances in which the defendants repeatedly deprived Martin of constitutionally adequate care. *See* Unified Compl. ¶ 179. Viewing the unified complaint in the light most favorable to the plaintiff and for the reasons stated above, there are sufficient facts pleaded in Count III to demonstrate that the plaintiff intends to hold Corizon accountable for its own conduct, and not vicariously liable for the conduct of others.

### III. Conclusion

The plaintiff has pleaded sufficient facts to state claims against Corizon Health, Incorporated and Claire Pei, D.O., except as to Count IV, which was brought under Title II of the Americans with Disabilities Act.

Accordingly, it is **ORDERED** that the motion to dismiss by defendants Corizon Health, Incorporated and Claire Pei, D.O. (R. 99) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Count IV of the unified complaint is **DISMISSED WITH PREJUDICE** as to defendants Corizon Health, Incorporated and Claire Pei, D.O., only. The motion is **DENIED** in all other respects.

It is further **ORDERED** that, because the motion and response fully set forth the arguments, and oral argument will not assist in the disposition of the motion, the Court will decide it on the papers, s*ee* E.D. Mich. LR 7.1(f)(2), and hearing scheduled for September 25, 2018 is **CANCELLED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Date:   September 24, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 24, 2018.

s/Susan K. Pinkowski  
SUSAN K. PINKOWSKI

---